JACOB DARST

*v.*

WILLIAM G. BATES *et al.*

*Filed at Ottawa June 16, 1880.*

1. RELEASE—*as to second mortgage.* Where the holder of a mortgage on real estate executed an instrument to a third person, taking a junior mortgage or trust deed for $10,000, in which he released his prior lien in favor of the second, but no further, and in favor of no other person, it being understood by the prior mortgagee that the money raised on the second incumbrance was to be expended in improving the mortgaged premises, it was *held* that whether the second mortgagee, whose mortgage was made a prior lien, should remain entitled to such lien, or some one else should occupy his place and succeed to his rights, could make no difference with the prior mortgagee, and that a party raising the money on the faith of such junior mortgage, or equitably entitled to stand in the shoes of the second mortgagee, had the right to foreclose the same as the prior lien.

2. Where a party holding a mortgage on real estate, used as hotel property, for the purpose of enabling the mortgagor to raise $10,000, with which to improve the premises, releases his mortgage in favor of another to that amount, who takes a mortgage or deed of trust for that sum to secure the mortgagor's

---

* The original opinion in this case was filed February 4, 1880, but upon a rehearing a supplemental opinion was filed June 16, 1880.

notes, amounting to the same sum, it being understood at the time of the release and the giving of the new notes and mortgage, that the second mortgagee was not to make the loan to the mortgagor directly, but was to procure the same by guaranteeing and discounting other notes of the mortgagor, it was *held* that the first mortgagee could not afterwards be heard to urge the objection that the money was not raised on the faith of the trust deed or second mortgage, but by discounts of other paper of the mortgagor guaranteed by the second mortgagee, or party for whose benefit the trust deed was given to protect him on his guaranty; and that the mortgagor failed to expend the money as he had agreed, could make no difference where the party holding the second mortgage or trust deed was no party to such agreement.

3.  SURETY—*whether party occupies that relation.*  A prior mortgagee who releases his prior lien in favor of another, taking a deed of trust to secure him as guarantor of the mortgagor's notes, whereby to raise money for the mortgagor, to be used in repairing and improving the mortgaged premises, can not be regarded as occupying a position in relation to the trust deed as analogous to that of a surety, as his postponement of priority of lien is an original, independent undertaking on his part, based upon a valuable consideration, the agreement of the mortgagor to expend the money raised in improving the mortgaged estate, and thereby enhancing the security.  In such case the first mortgagee, in regard to the trust deed, occupies the position of a junior mortgagee.

4.  MORTGAGE—*when debt is reduced to a judgment.*  Where a mortgage is given to secure a debt, and the debt becomes merged in a judgment, the mortgage stands as a security for the judgment.  So, where a settlement is had between a mortgagor and mortgagee, and a new note given for the balance due, upon which a judgment is taken by confession, which is not collected, this will not operate as a release of the mortgage debt.

5.  SAME—*effect of improper conduct of mortgagee.*  It is no objection to the foreclosure of a mortgage by a party who is a director of a bank, that he and another director may have improperly acted towards the bank in procuring the money loaned.  That is a matter between the directors and the stockholders of the bank.

6.  SAME—*right of party paying to avail of.*  Where A procured B, as his attorney, to obtain a loan of $10,000 by discounting A's paper, for which B was to have a commission, and A gave B his four notes of $2500 each, secured by a deed of trust to C, to indemnify him in guaranteeing A's paper, and B obtained of a bank a temporary loan by guaranteeing A's notes, and afterwards procured C, the trustee, to procure a further loan to meet the payment of the first loan, which C did of the same bank, by agreeing to see the debt paid, and guaranteed the paper of A, from time to time, as it was renewed, it was *held* that C, upon payment of the sum due the bank, and for which he was bound as guarantor, was entitled to foreclose the deed of trust given to

secure B, as the attorney and agent of A, the last loan being regarded as the real loan, and that the notes and deed of trust to B were collateral security only for the debt incurred by C, he being primarily liable to the bank.

7. COLLATERAL—*does not release original debt.* The acceptance of collateral security on the making of a loan, or afterwards, has no effect whatever on the original debt, either to impair or suspend the right of action.

8. STATUTE OF FRAUDS—*paying debt of another.* Where the party's promise is, in effect, to pay his own debt, though that of a third person be incidentally guaranteed, it is not necessary that it should be in writing.

9. SUBROGATION—*of guarantor or surety.* Where a party pays a debt which he is legally bound to pay for another, as surety or guarantor, he will, in equity, be entitled to be subrogated to all the securities held for its payment, and this, though he may have been the trustee, empowered to sell by a deed of trust.

10. SAME—*on redemption from prior lien.* A person occupying the position of junior mortgagee, or his assignee, may redeem from a deed of trust which is a prior lien, and thereby be subrogated to any and all securities held by or for the benefit of the holder of the prior lien.

11. USURY—*who may plead.* It is only the debtor that can plead or set up usury. If he or his surety pays the same it is no concern of others.

12. FORECLOSURE—*interest, whether on note or judgment thereon.* Where a debtor, whose debt was secured by a deed of trust, on an accounting and settlement 'six months before the debt was due, gave his note, payable six months after date without interest, for the sum found to be due, including interest on the original debt till its maturity, and upon which judgment was immediately confessed, it was held that, on bill to foreclose the trust deed, it was error to compute interest on the judgment from its date, and that it should have been computed on the note, which bore no interest till due.

APPEAL from the Appellate Court for the Second District; the Hon. N. J. PILLSBURY, presiding Justice, and the Hon. JOSEPH SIBLEY and Hon. EDWIN S. LELAND, Justices.

On the 19th day of January, 1856, Warren Hall and Ashbel Hurlburt mortgaged lots 3, 4 and 5, in block 8, in the city of Peoria, (on which was the Peoria House,) to Augustus O. Garrett, to secure the payment of $29,500, exclusive of interest, evidenced by thirteen promissory notes, the last ten of which were dated September 1, 1855, payable in one, two, three, four, five, six, seven, eight, nine and ten years from date, for $2500 each, with interest thereon, payable semi-annually.

On the 13th day of October, 1856, Augustus O. Garrett executed to said Hall and Hurlburt an instrument in writing, reciting that whereas said Hall and Hurlburt had, on that day, made a deed of trust conveying the lots described in his mortgage, to Caleb Alden, as trustee, to secure the payment of $10,000, with interest thereon, to one William G. Bates, according to the tenor and effect of their four promissory notes to said Bates, and purporting, in consideration thereof, to forever release all claim or lien which he held, by virtue of his mortgage, upon the before described premises, so far as the same might affect the deed of trust and the security of the said Bates thereby, but no further. This was not delivered until some time afterwards, that is to say, on the 30th day of October, 1856, at which time Hall and Hurlburt executed and delivered to Bates their four several promissory notes, for $2500 each, and a deed of trust, securing the same, upon the lots before described, to Alden, as trustee. All of these instruments were filed for record, in apt time, in the proper office.

It is claimed by the administrators of Alden that these notes and this trust deed were to protect Bates against loss as guarantor for Hall and Hurlburt, on a line of discounts in bank for $10,000, and that the money to be so obtained was to be expended in improvements on the lots described in the mortgage and the deed of trust; and that this was known to Garrett, and formed the chief consideration for his postponing his mortgage to the trust deed; that the agreement was, in substance, that Bates was employed by Hall and Hurlburt, as their attorney, to effect a loan for them on bankable paper, which they were to furnish and renew from time to time, and which he was to guaranty to the amount of $10,000, for which Bates was to have a compensation of $400. And it is further claimed that, after the execution and delivery to Bates of the notes and deed of trust, and on the third of November, 1856, Bates, for the accommodation of Hall and Hurlburt, borrowed of the Westfield Bank, of Westfield,

Mass., upon a note signed by himself, without other security than his own name, $9585, (leaving due $400 for his compensation as agreed upon, and $15 for prior services,) which sum he caused to be delivered to Hall and Hurlburt; that, about the middle of November, Bates received a note of $10,000, dated November 1, 1856, signed by Hall and Hurlburt, payable to the order of Peter Sweat, on the first of May, 1857, at the Continental Bank of New York, indorsed by said Sweat; that he also, at the same time, received a note of the same parties, date and time of payment, for $500, as payment of the semi-annual interest on said $10,000 note; that Bates took these notes to Alden, with whom he had an agreement that he (Alden) was to have ten per cent interest on the loan during its continuance, in consideration that Alden should procure the discount of the notes by the directors of the Westfield Bank; that Alden thereupon procured the notes to be discounted, and paid the money over to Bates, who then used the same in paying off his own note at the bank for $9585, and the $415 due himself from Hall and Hurlburt, as before stated; and that, in order to obtain this discount, Alden had to obligate himself to the bank to repay the same.

On the first of May, 1857, the before-mentioned notes not being paid, other notes were executed by Hall and Hurlburt, and satisfactorily indorsed, and also indorsed by Bates, and were procured by Alden to be discounted at the Westfield Bank, for money to take them up.

Other discounts and renewals, etc., were had in the same way, from time to time, until in February, 1860, when, upon an accounting, Hall and Hurlburt were found to be indebted in the sum of $9350.59, for which they gave their note to Bates, payable in six months, and, on the same day, also caused to be entered up a confession of judgment, for the same amount, to Bates, as security for the same. This note was indorsed by Bates by his attorney in fact, and was discounted at the Westfield Bank, like the prior notes. Nothing was ever collected on the judgment, and when Darst's bill of

foreclosure was filed, as hereinafter stated, the note remained in the possession of the bank, unpaid.

On October 6, 1860, lot 3 and a part of lot 4 were released by Bates and Alden, and Darst also, to one Luther Cord, for which $2500 were paid and credited on the indebtedness of Hall and Hurlburt secured by the trust deed.

February 1, 1862, Hall, having purchased Hurlburt's interest, leased the premises to Alfred Freeman and Henry King, by written lease; and this lease, Hall, in April, 1862, assigned to Bates, on condition that he would pay taxes and insurance, and apply rents on notes and judgments, and he continued to receive the rents and so apply them until the appointment of a receiver in this court.

In October, 1859, all the notes executed by Hall and Hurlburt to Garrett, except the last six, having been paid, Garrett sold and assigned these to Jacob Darst.

On the third of January, 1863, Jacob Darst filed his bill in chancery, to foreclose the Garrett mortgage, against Warren Hall, Ashbel Hurlburt, William G. Bates, Caleb Alden and Alfred Freeman. On the 30th of May, 1863, William G. Bates filed his answer thereto; and on the 20th day of January, 1860, William G. Bates filed his bill against Hall and Hurlburt, and Darst, to foreclose the deed of trust executed to Alden as trustee.

On the ninth of February, 1863, Darst filed his cross-bill to Bates' bill for foreclosure, setting up, in substance, the same matters as set forth in his original bill of foreclosure.

Answers were filed to this by Bates and Alden, and on the 10th of June, 1864, Darst filed an amendment to his bill of complaint, to which answers were also filed.

On the 15th of January, 1866, Bates filed an amendment to his bill of foreclosure, and answers were filed to this.

The suits were consolidated, and the cause was heard by the court below, when a decree was rendered dismissing Bates' bill for foreclosure, and rendering a decree of foreclosure in

favor of Darst, upon terms, however, which were not satisfactory to him, and both parties appealed to this court.

The cause was heard here at the September term, 1869, and the decree below was reversed and the cause remanded.

On the third day of February, 1869, Caleb Alden paid the amount computed to be due the Westfield Bank, on account of the discounts in favor of Hall and Hurlburt, $12,626.74. And, after the before mentioned case was remanded to the court below, on the 22d day of July, 1870, said Alden filed his amended cross-bill to the bill of complaint of Darst, claiming, and alleging therein, that he was entitled to foreclose the deed of trust, having paid the amount secured thereby, etc. Answers were filed to this, to which there were proper replications.

On final hearing, all of the bills and cross bills, etc., having been consolidated, it was, in substance, decreed that the trust deed was a prior lien to the mortgage of Garrett, and that Alden's administrators (he having died pending the proceedings) were entitled to the amount to be recovered, by virtue of the trust deed.

From that decree Darst appealed to the Appellate Court for the Second District. That court affirmed the decree of the circuit court, and Darst brings the record here by appeal from that decision.

The other facts, material to an understanding of the questions discussed, sufficiently appear in the opinion.

Mr. J. S. STARR, and Mr. D. McCULLOCH, for the appellant, after stating the facts of the case, made the following points, among others, in their argument:

Garrett had the first lien, and to the extent of that lien had a special property in the premises. When one suffers his property to become pledged for the liability of another, he, *as to his property so pledged,* occupies a position analogous to a surety for that liability, and is entitled to be dealt with as such. *Neinecewicz* v. *Gahn,* 3 Paige, 614; Same case, 11 Wend.

312; *Robinson* v. *Gee,* 1 Ves. Sr. 251; *Paterick* v. *Powlet,* 2 Atk. 383.

Time given to the principal discharges the mortgage from the debt so extended. *Neinecewicz* v. *Gahn,* 3 Paige, 620; *Boultbee* v. *Stubbs,* 18 Ves. 20; *Bowmaker* v. *Moore,* 3 Price, 214; *Neinecewicz* v. *Gahn,* 11 Wend. 324.

In such case the surety (mortgagee) is entitled to be subrogated to the principal creditor and so given a priority over subsequent incumbrancers. *Neinecewicz* v. *Gahn,* 3 Paige, 621; *Aquilar* v. *Aquilar,* 5 Mad. 414; *Hawley* v. *Bradford,* 9 Paige, 200; Glancy's Husb. & Wife, 589.

The same principle, in a modified form, is applied in the case of successive mortgages. If the first mortgagee has two tracts in his mortgage, and the second but one of them, equity will compel the first mortgagee to first exhaust that tract not covered by the second mortgage. But if, with notice of the second mortgage, he releases the latter tract, he must suffer an abatement of his debt, *pro tanto,* as to the second mortgage. *Tice* v. *Annin,* 2 J. C. R. 125; *Parkman* v. *Welsh,* 19 Pick. 231; *Cheesebrough* v. *Willard,* 1 Johns. Ch. 425; *Iglehart* v. *Crane,* 42 Ill. 202; *Guion* v. *Krapp,* 6 Paige, 35.

So if the mortgagee holds other securities and releases them, he must suffer the consequences. *Foss* v. *City of Chicago,* 34 Ill. 488; *Phares* v. *Barbour,* 49 id. 570.

Equity treats the land as the primary fund out of which the debt is to be made. The owner of the equity of redemption is the principal debtor, all others being merely sureties. The right of subrogation therefore exists in favor of all intermediate parties until the debt is made to fall ultimately upon the owner of the fee. *Marsh* v. *Pike,* 10 Paige, 595; *Cumberland* v. *Codrington,* 3 J. C. R. 229; *Rawson* v. *Copeland,* 2 Sandf. 278; *McLean* v. *Towle,* 3 Sandf. 128; *Curtis* v. *Tyler,* 9 Paige, 432; *Hays* v. *Ward,* 4 J. C. R. 123.

One of the consequences of this doctrine is, that if the creditor impairs this right of subrogation as to any person whose property stands towards him in the relation of surety-

ship, he thereby releases the property so charged. *Tice* v. *Annin*, 2 ᢺ. C. R. 125.

The waiver was personal to Bates and for the benefit of no other person. The proof is that Bates only professed to hold the notes to indemnify himself. But whether this be so or not, the deed absolutely prohibited any other person from participating in the benefit of the waiver. *Jones* v. *Quinnipiack Bank*, 29 Conn. 25; *Hall* v. *Cushman*, 16 N. H. 462; *Miller* v. *Mack*, 1 N. J. Eq. 204; *Hawley* v. *Bradford*, 9 Paige, 200; *Myers* v. *Parker*, 6 Ohio St. 501; *Leggett* v. *Humphries*, 21 How. 66; *Hunt* v. *Smith*, 17 Wend. 180; *Ban*: *of Steubenville* v. *Cowell, etc.* 5 Ohio, 214.

A court of equity will never enlarge a contract of suretyship. It is a contract to be strictly construed in all courts for the benefit of the surety. *United States* v. *Boyd*, 15 Pet. 208; *Dobbins* v. *Bradley*, 17 Wend. 442; *State of Ohio* v. *Medoy*, 17 Ohio, 565; *Wallers* v. *Simpson et al.* 2 Gilm. 570; *Governor* v. *Lagow*, 43 Ill. 142.

*Alden's relation to these securities:*

He is trustee in the deed of trust and chargeable with notice of the terms of Garrett's deed, for all his claims to priority are dependent upon it.

After the maturity of all the paper, he, as director of the bank, consented to a surrender of all the paper indorsed by Sweat, and upon which Bates was chargeable as guarantor. Bates then took a new note which Alden *never guaranteed.*

As a volunteer he has paid the bank, but *Bates is not liable to him.* The bank can not hold Bates, for *its* debt is paid. Alden can not hold Bates, for Alden does not own the note. Bates can not be damnified, and until he is damnified he can not foreclose. Alden can only come in by subrogation to Bates, but Bates having no equities Alden can have none. *Sanford* v. *McLean*, 3 Paige, 117; *King* v. *Whiteley*, 10 id. 465; *Bonham* v. *Galloway*, 13 Ill. 68.

Under no circumstances can Alden, even if he does occupy the position of creditor, become entitled to this security until

the liability of Bates has become absolutely fixed.  *Tilford*
v. *James,* 7 B. Mon. 336; *Peters* v. *Goodrich,* 3 Conn. 146;
*Abbott* v. *Upton,* 9 Pick. 434; *Van Rensselear* v. *Aiken,* 22
Wend. 549.

Another reason why he can not have any relief is that he
is trustee in the deed of trust, and has no right to allow it to
be used for any purpose not clearly within the terms of the
Garrett deed, especially for his own benefit.

*Trust deed discharged by novation of debt:*

The arrangement under which Garrett made his deed of
postponement in favor of· Alden, as trustee for Bates, was
that Bates should guaranty for Hall and Hurlburt a line of dis-
counts, upon their furnishing him bankable paper with a
good indorser for that purpose. It is not stated how long
that arrangement was to continue, but the proof is that Hall
and Hurlburt were to reduce the debt at the rate of $2500 per
year.  The amount was the same in the notes secured by the
deed of trust, and, no doubt, the time was the same.

Now, Darst's right of subrogation became fixed at the ma-
turity of the deed of trust, and no one had any right to
change or waive any rights or liabilities, after that time, so as
to affect his interests.  His rights were seriously affected by
that arrangement.

There was, in fact, a novation of the debt, a new principal
was formed, a new payee was made, new security was taken,
and old securities were released.

The mortgage was no security for the substituted note.
*Ayers* v. *Wattson,* 57 Pa. St. 368; 2 Parsons on Notes and
Bills, 135; *Hart* v. *Hudson,* 6 Duer, 294; *Woodward* v. *Ward,*
37 Minn. 564.

Messrs. JOHNSON & HOPKINS, for the appellees, after stat-
ing the facts of the case and the state of the pleadings,
made the following points in their argument:

That the lien of Garrett's mortgage, held by Darst, was
postponed by Garrett, the holder of the mortgage, that the

mortgage or trust deed might become a first lien, and that the loan might be made for the purpose of improving the property.

That the property was improved by the application of the money obtained from Bates for that purpose, and that Garrett, while holder of the notes and mortgage, knew the loan was obtained on the mortgage upon the faith of his release, saw the money applied, held his mortgage for years afterward before he turned over the notes and mortgage to Darst (in the fall of 1859), and made no objection, and gave no sign of dissent.

That Darst became the holder of the notes and mortgage, with both actual and constructive notice of the release of Garrett.

It is obvious that Darst stands in no better position, at the most, than would Garrett had he still retained the notes and mortgage.

The relative position of Alden and Garrett was that of first and second mortgagees, to each of which the debt was the principal and the mortgage the incident. This position of Garrett resulted from Garrett's release of his mortgage as to the trust deed of Alden, the second mortgagee having the right to redeem from the first, and the mortgagor the right to redeem from both.

Appellant's relative position in the case is no better than if he was Garrett.

As second mortgagee he has a right to redeem from the prior incumbrance, and to be subrogated to the security on such redemption.

His position gives him the right to inquire how much debt there was, and how much of it remained unpaid.

In a prior hearing in the case the court say: "The deed of trust having been given to secure the debt, and it in substance remaining unpaid, the trust will be kept alive to secure its payment." *Darst* v. *Bates et al.* 51 Ill. 446.

The negotiable paper furnished by mortgagors for the con-

venience of the parties in floating the loan were, in their relation to the debt, not unlike duplicate bills of exchange. They only represented one and the same debt for the convenience of the parties, and were not intended by the parties to be, and were not a release, discharge or payment of the mortgage debt. They were made and used as floats to enable Bates and Alden to carry the loan.

The reason why a renewal or change of the mortgage notes does not impair the security is, because the debt is not thereby paid, and the same principle applies with more force to the duplicate or negotiable notes, as the original mortgage notes in this case were never given up, renewed, paid or changed, and the duplicates, never intended as payment, were never paid by the makers and mortgagors. Ibid. 51 Ill.; *Shiras* v. *Craig & Mitchell,* 7 Cranch, pp. 34 and 50; *Seymour* v. *Darrows,* 31 Vt. 123; *Hubbard* v. *Savage,* 8 Conn. 215; *Ketchum* v. *Jauncey,* 22 Conn. 127.

The security for a debt, in whose hands soever it may be, is a fund in trust for the payment of the debt. *Moses* v. *Murgatroyd,* 1 Johns. Ch. 118; *New London Bank* v. *Lee et al.* 11 Conn. 112; *Homer* v. *Savings Bank,* 7 id. 478; *Eastman et al.* v. *Foster et al.* 8 Metc. 19; *Belcher* v. *Hartford Bank,* 15 Conn. 480; *Hayes* v. *Ward et al.* 4 Johns. Ch. 123.

The confession of judgment by Hall and Hurlburt was no payment of the debt. Had it been made to Alden, the equitable mortgagee, its only effect would have been to merge the notes or debt in the judgment.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

When this case was in this court at a former term,—*Darst* v. *Bates et al.* 51 Ill. 439,—the court was under the impression that the notes described in the deed of trust, which was executed by Hall and Hurlburt to Alden as trustee, had been renewed from time to time, and what was then said in respect of the deed of trust was upon that hypothesis. It now very

clearly appears, from the examination we have given to the record, that those notes were not renewed.  Other notes were given by Hall and Hurlburt to Peter Sweat, and by him indorsed to William G. Bates, which Bates also indorsed, and, through Alden, procured to be discounted at the Westfield Bank, in Westfield, Mass., to raise $10,000; and it was these notes, and not the notes described in the deed of trust, that were taken up and renewed by substituting other notes in like manner secured, from time to time.  It is contended by appellees that the notes described in the deed of trust, as secured by that instrument, were held as security for these notes that were thus discounted and renewed from time to time, and the question to be determined is, whether the administrators of Alden (who has died intestate since the pending of these suits), in view of all the facts proved, are entitled to have a foreclosure of that trust deed as a prior lien to the mortgage executed to Garrett and now held by Darst, to indemnify Alden's estate for money that Alden paid to the Westfield Bank in consequence of those discounts.

Having made this correction and explanation in regard to the facts, we are not disposed to depart, in the expression of our views of the law, from what is said in the former opinion.

The instrument by which Garrett gave a priority to the trust deed to Alden, as trustee, to secure the payment of the notes to Bates, is as follows:

"Whereas, I, Augustus O. Garrett, of the city of Peoria, in the State of Illinois, hold a certain mortgage made by Warren Hall and Ashbel Hurlburt upon lots three, four and five, block No. eight, in the city of Peoria; and whereas, the said Hall and Hurlburt have this day made a deed of trust conveying the said lots to Caleb Alden as trustee, said last recited conveyance being to secure the payment of $10,000, with the interest thereon, to one Wm. G. Bates, according to the tenor and effect of four promissory notes made by Hall and Hurlburt to said Bates:  Now, therefore, in consideration of one dollar to me in hand paid by said William G.

Bates, I do hereby now forever release all claim or lien which I have by virtue of any mortgage or lien upon the said above described premises, as to and so far as the same may affect the lien of the said deed of trust and the security of the said Bates thereby, but no further. It being the true intent and meaning hereof that, as between the said Bates and myself, the said deed of trust for the benefit of the said Bates shall be deemed a valid and first lien upon said premises, and that my mortgage shall be deemed and considered a lien on the same second in priority to said deed of trust. This made for the sole benefit of said Bates, it not being the intent hereof to in any manner release or waive the lien of my said mortgage as to any other parties. Witness my hand and seal at Peoria, this, the thirteenth day of October, A. D. 1856.

A. O. GARRETT, (Seal.)"

According to the answers of Hall and Hurlburt, made under oath, and in response to material allegations in Darst's bill, this instrument was executed pursuant to an agreement made between Garrett and Hall and Hurlburt, to enable them to obtain a loan of $10,000 through the assistance of Bates, (who was to guaranty their notes or bills indorsed or accepted by Peter Sweat or some other person,) for the purpose of expending said sum on the mortgaged premises in repairing, enlarging and improving the same, and rendering them more valuable.

In view of this, it is manifest that a fair and reasonable construction of the instrument is to postpone the lien of Garrett's mortgage to that created by the deed of trust therein recited. It was intended that, as to that $10,000, the Garrett mortgage should be a junior lien, but that in no other respect, and for no other purpose, should its priority be waived or relinquished. Whether Bates should continue to be entitled to that trust deed, or some one else should occupy his place, could make no possible difference to Garrett. It was not the *person,* but the *loan,* in which he was interested, and the name of Bates is used simply to make more specific and

certain the particular deed of trust. This was the view entertained by the court when the case was here before, as will be seen by reference to the opinion then filed, and it is totally unaffected by the misapprehension of facts under which the court then labored.

In our opinion, therefore, the postponement or relinquishment of the first lien, under the Garrett mortgage, is not limited to the person of Bates, but it is equally for the benefit of any person who is equitably entitled, apart from that instrument, to stand in the shoes of Bates, as regards the debt secured by the deed of trust.

We are, moreover, of opinion that Garrett, having entered into a contract with Hall and Hurlburt in regard to relinquishing or postponing the priority of his lien, for the purpose before stated, with full knowledge of the mode in which Bates was expected to raise the needed money, can not now be heard to urge the objection that the money was not loaned on the faith of the trust deed, but was obtained by discounts of other paper of Hall and Hurlburt. He knew, according to the evidence afforded by Hall and Hurlburt's answers, that the money was not to be obtained by a direct loan on the faith of the trust deed, but by discounts of their paper when guaranteed by Bates, and that the trust deed was intended to protect Bates in guaranteeing the paper to be thus discounted. He has not, therefore, been defeated or disappointed in this respect. Whether Hall and Hurlburt have kept faith with him, as to the use of the money thus obtained, is quite another question. He relied solely on their agreement in that respect, and there is no authority in the record for saying that either Bates or Alden was party or privy to that agreement.

The point is made, and pressed with some apparent earnestness, by counsel for appellant, that Garrett occupied a relation to the trust deed analogous to that of surety, and hence that his postponement or relinquishment of priority should be

held to be revoked or canceled by all acts or circumstances that would, in the case of a surety, be held to release him..

Without conceding that, under the evidence, there appear here to be any acts or circumstances which would, in the case of a surety be held to release him, we think it sufficient to say, in our opinion the position of Garrett, in relation to the trust deed, can not be held to be analogous to that of surety, for this reason, if for no other : Accepting the evidence afforded by the answers of Hall and Hurlburt to be true, his postponement or relinquishment of priority was an original and independent undertaking upon his part, based upon a valuable consideration, namely, the concurrent undertaking of Hall and Hurlburt that the money to be obtained by the loan should be used in improvements, repairs, etc., upon the mortgaged property, thereby appreciating the value of his security. We think the position of Garrett, with regard to the trust deed, is precisely that of any other junior mortgagee—his rights are no more and no less.

Another point, urged with some show of earnestness, which, we think, may be disposed of with very few words, is this: In February, 1860, there was an accounting between Hall and Hurlburt and Bates, in regard to the paper guaranteed by Bates for them and discounted at the Westfield Bank, upon which it was found there was due from Hall and Hurlburt to Bates $9350.59, for which amount they then gave him their note, on six months' time, and, on the same day, confessed a judgment in his favor. The note was indorsed by Bates, by his attorney in fact, to the Westfield Bank. Nothing was ever collected on either the judgment or the note, but it is argued this was a novation, and operated as a release of the trust deed.

This point was fully considered when the case was here before, and it is not affected by the misapprehension of fact under which the court then labored. It was then held the reduction of the note to judgment did not in anywise affect the trust deed.

Where a mortgage is given to secure the payment of a debt, and the debt becomes merged in a judgment, the mortgage stands as security for the judgment. *Wayman et ux.* v. *Cochrane*, 35 Ill. 152. See, also, *Rogers* v. *Trustees, etc.* 46 Ill. 428; *Hamilton* v. *Quimby et al.* id. 90; *Flower* v. *Elwood*, 66 id. 438; *Worcester National Bank* v. *Cheeney*, 87 id. 602.

The question of most difficulty is, did Alden occupy such a relation towards the loan effected by Hall and Hurlburt, by means of their discounts, that he can be held, in equity, entitled to take the place of Bates, and enforce a foreclosure of the deed of trust and avail of the proceeds.

Since this case was here before, Alden paid to the bank of Westfield the amount due on the note for $9350.59, given by Hall and Hurlburt on settlement in 1860, which had remained, from the time of its assignment by Bates, in the possession of the bank, unpaid.

Appellant's counsel insist that this payment was purely voluntary on the part of Alden.

The proof sufficiently establishes these facts: In the month of June, 1856, Bates was employed by Hall and Hurlburt, as their attorney, to obtain a loan of $10,000 for them, which they wished to expend in repairs and in the erection of additions to the buildings situated upon the premises described in the mortgage and deed of trust in controversy. After making some ineffectual efforts to obtain this loan,—it having been agreed between Hall and Hurlburt that they would pay him a commission of $400, and make their four promissory notes for $2500 each, secured by first mortgage or deed of trust upon the property in controversy, to protect and indemnify him against loss as their guarantor, and that they would also furnish him with good bankable paper, properly secured by personal security, which he was to indorse and guaranty, for the purpose of discounting to raise the $10,000,—Bates, on the —— day of October, 1856, advanced, of money which he borrowed of the Westfield Bank on his own note, the desired $10,000, less his commission, and a debt of $15 owed him by

Hall and Hurlburt,—that is to say, $9585; and he then applied to Alden to effect the loan of the $10,000, as the attorney of Hall and Hurlburt, offering as security the securities furnished by them to him, and his personal guaranty of the bankable paper to be discounted. Alden agreed, thereupon, to effect the loan for him; and it was then, in consideration thereof, further agreed between them, and reduced to writing, as follows:

"Mem. of agreement—W. G. Bates, A. C. Alden and others:

"Bates is to hold the four notes of $2500, and the mortgage to secure them, as security for himself as indorser of the floating notes of H. and H., and also as security for Alden, and Alden and others, for raising the money on the negotiable notes furnished by H. and H., and to guaranty the same to Alden, and Alden and others, who may raise the money, and he is to apply the payments and net proceeds received from H. and H. on the loan, as received by him, till the same is paid, the rate of interest on the notes to be taken by Alden being 10 per cent, as discount, to be paid by H. and H. He agrees to enforce the payment of loan by proper legal proceedings, in case of neglect, or to allow Alden, and Alden and others, to do so in his name, if he declines to do so, if such shall be thought best, *it being understood that Alden, either by himself or with his friends, is to raise the money to the amount as mentioned in the four mortgage notes, and for the time proposed as agreed,* in case said Bates shall furnish him with negotiable paper of H. and H., and by Bates, or guaranteed by him.

"[Signed,]          W. G. BATES.

"*November* 3, 1856."

Although this was signed by Bates alone, the evidence is full and satisfactory that it was written as evidencing the real agreement between Bates and Alden, and that one copy was given to and accepted by Alden as such, and the other was retained by Bates.

Alden then took the note executed by Hall and Hurlburt

to Peter Sweat, and by him indorsed, and guaranteed also by Bates, for $10,000, payable May 1, 1857,—obtained $10,000 of the Westfield Bank, which he paid over to Bates, as the attorney of Hall and Hurlburt, and deposited this note as collateral security for the payment of the $10,000. Bates repaid himself with this $10,000—the money he had previously advanced, and the amount due him for commissions, etc. But this we regard as precisely the same as if the $10,000 had gone directly to Hall and Hurlburt. All the parties treated this as the real loan, and the advancement by Bates as but a temporary accommodation replaced by this money. In all the subsequent renewals of notes, discounting, etc., this was, by all the parties, treated and regarded as the real loan.

Alden, in giving his evidence, says: "I told said Bates that I would accept the proposition," (that is, the proposition to raise the $10,000,) "and would raise the money, from time to time, till the debt of Hall and Hurlburt should be paid." And again: "I received the notes which were guaranteed or indorsed by said Bates, and I procured the same to be discounted, on my promise to pay the same in case of failure to pay by said Hall and Hurlburt, or said Bates. I also agreed with said bank, the late president, directors, etc., of the Westfield Bank, to be responsible in like manner for any paper which should thereafter be given by Hall and Hurlburt to said Bates as such collateral, and which should be guaranteed or indorsed by him." He had previously said: ". It was agreed by said Bates with me, as attorney for Hall and Hurlburt, that I should receive 10 per cent for interest on amount due on the loan, during its continuance." Again, he says: "The bank relied upon the credit and pecuniary responsibility of Hall and Hurlburt, Bates, who was a man of abundant responsibility and property, and, perhaps, upon my promise; but they had nothing to do with the mortgage of Hall and Hurlburt to secure the notes of $10,000 first spoken of; nor were they informed, so far as I know, of the existence of it.

The discount was made to me, by a majority of the directors, a few days after."

It is obvious the debt here to the bank was in reality Alden's debt. He, it is seen, was, by his contract with Bates, to "*raise* the money." He was to receive a compensation for so doing. The notes of Hall and Hurlburt, to be furnished and guaranteed by Bates, are called and treated as collaterals. Collaterals to what? Manifestly to Alden's promise to repay the bank. It is evident, from all the proofs, the bank did not loan money or give credit to Hall and Hurlburt. It did not buy these notes, nor accept them as payment of a pre-existing debt,—but it accepted them simply as a collateral security for the debt of Alden—leaving the primary liability upon him. Had Hall and Hurlburt or Bates paid these notes and discharged the debt to which they were collateral, Alden would, of course, have been discharged from further liability—but the notes not having been thus paid, their acceptance as collateral security had no effect whatever on the original debt, either to impair or suspend the right of action. *Wilhelm* v. *Schmidt et al.* 84 Ill. 187–8. The debt remaining unpaid, Alden was simply paying his own debt, and his liability was unaffected by the Statute of Frauds. Says Brown on the Statute of Frauds, p. 165, "It is a general principle, which prevails in all cases under this branch of the statute, that whenever the defendant's promise is, in effect, to pay his own debt, though that of a third person be incidentally guaranteed, it is not necessary that it should be in writing. The statute contemplates the *mere* promise of one man to be responsible for another, and can not be interposed as a cover and shield against the actual obligations of the defendant himself. The common case of the holder of a third person's note assigning it for value, with a guaranty, seems to be clearly referable to this principle. The assignor owes the assignee, and that particular mode of paying him is adopted ; he guarantees, in substance, his own debt." 2 Daniell on Negotiable Instruments, § 1761 ; *Smith* v. *Finch*,

2 Scam. 321; *Nelson* v. *First National Bank of Chicago*, 48 Ill. 36.

Alden having paid a debt which it was his legal duty to pay, is entitled to be subrogated to all the securities held for its payment. But apart from this, by the terms of his contract with Bates, he is entitled to resort to a foreclosure of the deed of trust for protection. And of the power of Bates to make such a contract, we think there can be no question. He might assign the notes by indorsement; or by a separate writing assign them absolutely or conditionally.

The suggestion that Alden being a trustee was prohibited from becoming interested in the trust fund, can have no force. His duty, as trustee, was simply to sell the property to satisfy the mortgage—and this could not be in anywise affected by the circumstance of what particular person might become the owner, legally or equitably, of the notes secured. Indeed, it is quite common to make the holders of the notes or their assignees trustees in mortgages, with powers of sale; and this has repeatedly received the approval of this court. *Longwith et al.* v. *Butler*, 3 Gilm. 32; *Strother* v. *Law*, 54 Ill. 413; *Bloom* v. *Van Rensselaer*, 15 id. 503.

So far as we are able to see from the evidence preserved in the record, Garrett's rights and those of Darst, as his assignee, as junior mortgagee, have never been impaired or interfered with. Garrett, until his assignment to Darst, and Darst since that assignment, has, at all times, been at liberty to redeem from the deed of trust and become subrogated to any and all securities to which such a redemption would entitle him. No contract has been made and no act done which could, in the slightest degree, prevent or embarrass such a redemption.

Darst, as assignee, when he purchased, had notice that his rights were those of junior mortgagee only. Presumably, he contracted with reference to that condition of security. It does not now lie in his mouth to deny that such were his rights.

Some criticism is made in argument with reference to the

33—95 ILL.

conduct of Bates and Alden towards the Westfield Bank, of which both were directors, and Bates was the nominal president. This, as we conceive, is a matter solely between the stockholders of the bank and these parties, which in nowise concerns Darst, who makes no pretence of having been injuriously affected thereby.

The question of usury, also, which is suggested rather than argued, does not concern Darst. Hall and Bates set up no such defence, and that ends it.

Perceiving no substantial error in the decree of the circuit court, the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*

Subsequently, upon a rehearing of this case, the following additional opinion was filed:

Mr. JUSTICE SCHOLFIELD:

One of the points made in appellant's original argument was, that "the circuit court erred in its order referring the cause to the master, by therein requiring the master to ascertain the amount due said administrator upon the basis of said judgment." By inadvertence, no notice is taken of this point in the foregoing opinion. Upon petition for rehearing a re-argument, on this point, was ordered. The question has been fully considered, and our conclusion is, the point is well made, and, in that respect, there was error in the ruling of the Appellate Court.

It will be recollected that in February, 1860, there was an accounting between Hall and Hurlburt and Bates, in regard to the paper guaranteed by Bates for them and discounted at the Westfield Bank, upon which accounting, the foregoing opinion recites, "it was found there was due from Hall and Hurlburt to Bates $9350.59, for which amount they then gave him their notes, on six months' time, and, on the same day, confessed a judgment in his favor," etc.

The decree of the circuit court recites this accounting, the

amount found due thereupon, the execution of the promissory note and confessing of judgment thereupon, and, among other things, refers it to the master in chancery to ascertain and report to the court the amount due and unpaid upon the said judgment, computing interest thereon at the rate of six per cent per annum, due annually, commencing at the date of the judgment, March 2, 1860, and, upon this basis, the master's report was made.

Cutler Laflin testified: "I know of a reckoning between Bates and Hall, in Peoria, in 1860; I ascertained what sum was due from them to said Bates; I went because Mr. Bates was sick; I carried with me sundry bills and notes of Hall and Hurlburt which were discounted at the Westfield Bank. Mr. Bates had also a mortgage made to Alden, as trustee, by Hall and Hurlburt, to secure the said Bates for his indorsing the paper of Hall and Hurlburt. Mr. Hurlburt took no part in the reckoning. The interest was cast at 10 per cent. The amount found due was $9350.59, *including interest to* the maturity of the note."

Taking this to be true, and it is clear the account should be taken of the amount due upon the note, and not of the amount due upon the judgment. Taking the account due upon the judgment, would give six months' interest, at six per cent per annum, upon the amount thereof, more than Hall and Hurlburt were required to pay.

But, waiving Laflin's evidence, it is the note, and not the judgment, that represents the debt secured by the deed of trust.

In the original opinion, we held the reduction of the note to judgment did not in anywise affect the trust deed, and we still adhere to that opinion. It stands as security still for the debt which it was intended to secure. That debt here, by the common understanding of all the parties, is evidenced by a note payable in six months without interest. By reducing that note, which is not yet due, and which does not bear

interest until it is due, to a judgment, does not change the equitable rights of the parties, as respects the debt.

For this error, in directing the master to compute interest upon the judgment from its date, instead of upon the note from its maturity, the decree below is reversed, and the cause remanded with direction to conform the decree below to this opinion. In all other respects the decree below is affirmed.

*Decree reversed in part, and in part affirmed.*